# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.  1:11-CV-12195-JGD

_____  )
NATIONWIDE BOOK INDUSTRIES LLC  )
                              Plaintiff,  )
                                       )
v  )
                                       )
A&S BOOKSELLERS, INC. [a/k/a  )
A&S BARGAIN BOOKS, a/k/a  )
A+S BOOKSELLERS, a/k/a  )
A+S CROWN BOOKS, a/k/a  )
CROWN BOOKS, a/k/a  )
CENTURY CITY/CROWN BOOKS] and  )
ANDREW WEISS  )
                               Defendants  )
_____)

## Plaintiff's Trial Brief

Pursuant to the trial court's Amended Pre-Trial Order and L.R. 16.5(f), Plaintiff, NATIONWIDE BOOK INDUSTRIES LLC ("NATIONWIDE") submits this Trial Brief.

### STATEMENT OF THE CASE

The Defendant characterizes this lawsuit as having little significance to the marketplace or to the court. The dispute turns on a series of small business transactions valued at less than $300,000; the debtor company, A&S BOOKSELLERS, Inc. and its affiliated d/b/a's ("A&S") are soon to be liquidated by a federal bankruptcy court; there are no assets to be distributed to non priority, unsecured creditors like NATIONWIDE; the Defendant, Andrew Weiss ("Mr. Weiss") assures the court that despite his best effort to keep his failing company afloat, there is nothing more here than a failed business deal. So, is there anything of significance at issue?

1

The core concept for redress under G.L.c.93A is unfairness under the circumstances of the case. Here, Mr. Weiss initiated the business transactions with NATIONWIDE in 2011. Mr. Weiss repeatedly misrepresented A&S as a growing, prosperous company when his own financial records demonstrate it had been failing dramatically since February 2008. Mr. Weiss made repeated assurances of payment and then offered plausible, yet false explanations for slow payment. Yet, he knew and certainly had access to actual knowledge that his business was contracting, that per store sales had plummeted year over year, that he had negative cash assets of close to $450,000 going in to 2011, that he had failed to pay hundreds of thousands of dollars in business taxes, that he had no access to credit, and that he could not make any substantial payments for 216,000 books purchased from NATIONWIDE. Nevertheless, he traded on his long business relationship with NATIONWIDE's principal, Erez Bredemehl ("Mr. Bredmehl"), assuming correctly that Mr. Bredmehl would, in good faith, trust him, accept his misrepresentations as fact, extend credit, and ship books to A&S.

Indeed, Mr. Bredmehl trusted him, only to reap an 80% loss. That loss is the largest non priority, unsecured debt in the A&S bankruptcy. For Mr. Bredmehl's small two year old business, the loss of $237,528.39 had a major adverse economic impact. In contrast, Mr. Weiss has liquidated his loss, has walked away; and with his wife as straw owner, he is off to a new business venture. He recently opened three new book stores in California. So much for trust.

That breach of trust is the significant issue in this case. That breach of trust is at the core of unfairness here. That breach of trust is grounded in misrepresentation upon misrepresentation calculated to fraudulently and deceitfully obtain inventory where there was no ability to make substantial payment. That breach of trust is unfair and deceptive in violation of c.93A, §§2,11.

I.       **THE DEFENDANT'S COURSE OF CONDUCT OF FRAUDULENT DECEIT AND MISREPRESENTATION ARE UNFAIR TRADE PRACTICES IN VIOLATION OF G.L. c.93A, §§2, 11**

As more fully set out in NATIONWIDE's Request for Findings of Fact, the Defendant, Mr. Weiss purchased and obtained more than 216,000 books from NATIONWIDE during 2011, having made numerous representations, assertions, and assurances concerning the state of his business, its growth and expansion, and his company's ability to pay. Mr. Weiss and Mr. Bredmehl had a long course of earlier business dealings from about 2001 to 2008. Relying on that and personal trust, Mr. Bredmehl accepted Mr. Weiss' representations, extended credit, and filled book orders from Mr. Weiss for six months in 2011. In all, Mr. Weiss made orders totaling $295,410 and then defaulted on $237,538.39.

Mr. Weiss obtained these orders through a course of conduct of knowing, material, and groundless misrepresentations and with no reasonable expectation of being able to make substantial payment. His business was not thriving but, in facts known to him for years, the company had been in cash flow insolvency as far back as February 2008. A&S failed to pay more than $200,000 in business taxes. By year end 2009, Mr. Weiss' business was in balance sheet insolvency as it suffered an operating loss of more than $268,000. By year end 2010, Mr. Weiss' business had unpaid loans in excess of $1.1 million, negative assets approaching $450,000, and no ability to raise credit in the marketplace. By year end 2010, Mr. Weiss knew also that his business was contracting and that per store sales had plummeted because of the ongoing expansion of an aggressive competitor. Simply put, he knew there was no basis whatsoever for his claims and assurances.

Trading on their long relationship and Mr. Bredmehl's trust, Mr. Weiss repeatedly deceived and misled Mr. Bredmehl to obtain orders on credit at a time when he had no ability to obtain credit – other than through deception. And he repeatedly promised payment when he had no reasonable expectation of being able to pay.

**A.     Mr. Weiss' Unfair, Deceitful Course Of Conduct Violates c.93A**

While c.93A looks to the common law, it is not bound by the common law. The key concept is unfairness - "discerned from the circumstances of each case". *Kattar v Demoulas*, 433 Mass. 1, 14 (2000), citing *Commonwealth v DeCotis*, 366 Mass. 234, 242 (1974) and *Kerlinsky v Fidelity & Deposit Company*, 690 F. Supp. 1112, 1119 (D. Mass. 1987), aff'd., 843 F.2d 1383 (1st Cir. 1988).

Unfairness by misrepresentation or deceit is a violation of G.L. c.93A, §§2, 11and is proved with even a single material statement that is susceptible of actual knowledge. The Defendant cannot avoid liability by characterizing his statements as mere opinion, judgment, or surmise.  *Powell v Rasmussen*, 335 Mass. 117, 118 (1969); *Evans v Yegen Associates*, 556 F. Supp. 1219, 1227 (D. Mass. 1983). *Rodi v. Southern New England School of Law*, 389 F. 3d 5, 20 (1st Cir. 2004); *Datacomm Interface Inc. v Computerworld, Inc.,* 396 Mass. 760, 788 (1986); *NPS LLC v Ambac Assurance Corp*., 706 F. Supp. 2d 162, 171 (D.Mass. 2010).

Here, Mr. Weiss' unfairness and deception are starkly apparent. He did not simply misspeak or offer an inaccurate opinion or make a reasonably based offer to pay on a single occasion. Repeatedly, he knowingly misrepresented his failing company's circumstances repeatedly and knowingly misled NATIONWIDE's principal owner repeatedly with claims, assurances, and promises that were knowingly groundless. He took advantage of Mr. Bredmehl's

4

trust based on their longstanding business relationship. He acted with false pretense and deceit. That is unfair as a matter of fact and as a matter of law.

**B.      Mr. Weiss Had No Reasonable Expectation Of Payment**

Nor can Mr. Weiss avoid liability for deceit and fraudulent misrepresentation with a claim that A&S had a reasonable expectation of making substantial payment to NATIONWIDE in 2011. In fact, Mr. Weiss paid less than 20% on a debt of almost $300,000. His repeated assurances of payment were inconsistent with facts known to him and were a deceitful effort to obtain inventory when his company had been insolvent for years and had no ability to pay or obtain credit.

This was not a case where an adverse outcome was sudden or unanticipated. Mr. Weiss saw it coming and could not reasonably claim that his company was prosperous or that it had ability to pay for new orders. He knew his company was in cash flow insolvency as early as year end 2008; it was in balance sheet insolvency by year end 2009; had unpaid loans in excess of $1,131,710 and negative assets approaching $450,000 in 2010; it had defaulted on more than $210,000 in sales taxes to the State of California along with numerous other debts; and had no ability to raise credit in the marketplace by year end 2010. Similarly, Mr. Weiss' claim that A&S was expanding and that Halloween and holiday sales would increase in 2011 on a per store basis was wildly inconsistent with facts known to him. The number of stores was contracting, and per store revenue had been dramatically reduced in 2010 because of an aggressive competitor that was continuing its expansion in the same marketplace in which A&S operated. In short, A&S could not pay and had no reasonable expectation of paying in 2011.

Under these facts, Mr. Weiss engaged in deceit and fraudulent misrepresentation in violation of c.93A by making repeated statements, assurances, and claims to secure purchases

when he knew there could not be any reasonable expectation that his company would or could make substantial payment. *Watson v Silsby*, 166 Mass. 57, 59-61 (1896).

**C.      Mr. Bredmehl Acted In Good Faith And Reasonably In Trusting Mr. Weiss**

Mr. Bredmehl and Mr. Weiss had a longstanding business relationship. And while Mr. Weiss paid slowly, he had always made full payment for his purchases. In their prior dealings from 2001 to 2008, Mr. Weiss had never failed to pay or defaulted or even made partial payment. Certainly, he had never misrepresented his business or ability to pay.

Mr. Weiss was a good business customer, and there was no reason to doubt his representations and claims and assurances. Accordingly, Mr. Bredmehl acted reasonably in trusting Mr. Weiss, in accepting his claims and assurances, and in extending credit for purchases made in 2011. Rodi , *supra,* 389 F. 3d at 20.

## II.      PLAINTIFF'S REQUEST FOR FINDINGS OF FACT

1. Erez Bredmehl is the principal owner of the Plaintiff, NATIONWIDE BOOK INDUSTRIES LLC ("NATIONWIDE").

2. NATIONWIDE is a small Massachusetts limited liability company.

3. NATIONWIDE is engaged in wholesale purchase, sale, and distribution of books and media. Routinely, NATIONWIDE sell books and media to retailers such as A&S BOOKSELLERS ("A&S").

4. Andrew Weiss is the sole owner of A&S and its affiliated d/b/a companies.

5. A&S and its affiliated d/b/a companies are being liquidated in a chapter 7 bankruptcy action, pending in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division, 1:12-bk-10392-VK. [stipulated]

6. Mr. Bredmehl and Mr. Weiss have known each other for many years. And Mr. Bredmehl has sold books and media to Mr. Weiss for a many years from about 2001 to 2008.

7. Mr. Weiss was frequently a slow payer, but, prior to the parties' renewed dealings in 2011, he was always straightforward in his dealings with Mr. Bredmehl and paid in full.

8. Based on their prior business dealings, Mr. Bredmehl trusted Mr. Weiss and accepted his statements and assurances as honest and reliable.

9. Mr. Bredmehl did not solicit orders from Mr. Weiss. He was approached by Mr. Weiss at a trade show in April 2011 who engaged him in a long conversation aimed at striking a deal to purchase books from NATIONWIDE.

10. At the trade show, Mr. Weiss reminded Mr. Bredmehl of their long association and profusely and repeatedly stated that his business was prospering and growing, that new stores were coming on line, that he wanted to stock the new stores, that payment would be made within 90 days after order, and that payment was not even a question given the success of his business.

11. Through Mr. Weiss, A&S purchased six shipments of books from NATIONWIDE and received 216,000 books beginning in April 2011 at invoiced charges of $295,410. **Trial Exh. 1** [stipulated]

12. Mr. Weiss placed two orders in early April, one for $61,105.80 and one for $57,795.20. Based on their prior dealings, Mr. Bredmehl saw no reason to doubt his assurances that payment would be made.  Of course, Mr. Bredmehl expected payments to be slow.

13. In mid June 2011, Mr. Bredmehl spoke with Mr. Weiss for about 15 minutes. He promised that full payment was forthcoming for the outstanding April invoices, and he placed two new orders, one for $47,417.00, a second for $54,669.00. Again, he assured

     ized Mr. Bredmehl that business was good and that payment for the outstanding orders would be made within a month.

14. Mr. Bredmehl relied on Mr. Weiss' assurances and representations and shipped the new orders.

15. Jill Bredmehl spoke with Mr. Weiss in early July 2011 and requested substantial payment.

16. Mr. Bredmehl was concerned enough that he called Mr. Weiss and offered a payment plan. Mr. Weiss again assured Mr. Bredmehl repeatedly that all was well and that his cash flow was slowed because of store expansion. He said he didn't need a payment plan and promised again to bring his account current.

17. Mr. Weiss' first payment was made several days later, less than $11,000. In August 2011, Mr. Weiss made a further payment of $5,000, reducing his balance to $205,191.80.

18. In mid September 2011, Mr. Weiss placed an additional order for $43,689.13.

19. By early October, Mr. Bredmehl was alarmed by the receivable which was now $248,880.93.

20. Mr. Bredmehl spoke with Mr. Weiss on October 7, 2011 for 27 minutes. Again, he was offered a payment plan. He declined and assured Mr. Bredmehl repeatedly that Halloween sales in his stores were robust. He said the entire account would be paid in full before year end.

21. In fact, Mr. Weiss' business was simply piling debt on debt at this point; he was well aware of his company's failure to pay debts back to 2008, its contraction, and its complete inability to pay creditors and meet government tax obligations. At no time, however, did he disclose the true and accurate facts of A&S' financial distress.

22. Mr. Weiss' claims of store expansion, strong Halloween sales, and the potential for more sales during the holiday season were false.

23. On October 14, Mr. Weiss and Mr. Bredmehl talked again. Still falsely claiming a highly successful Halloween sales campaign, Mr. Weiss promised to make weekly payments of between $10,000 and $15,000 through year end to reduce his balance. Mr. Weiss made four payments in October, totaling $42,086.00.

24.  Mr. Bredmehl authorized a final order for $30,733.46 on October 21, 2011.

25. No further payments were made by Mr. Weiss after October 2011.

26. The unpaid balance is $237,528.39. A&S paid less than 20% of the total amount due for orders made and books received from NATIONWIDE. **Trial Exh. 2** [stipulated]

27. NATIONWIDE is the largest non priority, unsecured creditor of A&S. Schedule F in Document 29 in Bankruptcy Case 1:12-bk-10392-VK, United States Bankruptcy Court for the Central District of California, **Trial Exh. 5** and Schedule F, Document 68 in Bankruptcy Case 1:12-bk-10392-VK, United States Bankruptcy Court for the Central District of California, **Trial Exh. 6.**

28. Mr. Weiss has submitted a Balance Sheet and a Profit & Loss statement for A&S for calendar years 2007 through 2011. **Trial Exh. 4 .**

29. Mr. Weiss claims that between 2007 and 2011, A&S expanded significantly, from two stores in 2007 to 12 in 2011. The claim of expansion materially misstates his own financial data. **Trial Exh. 4.**

30. A&S was already contracting in 2011 from 14 stores in 2010 to 12 in 2011. *See* Store count in the A&S Profit and Loss Statement **Trial Exh. 4 .**

31. A&S was in cash flow insolvency as far back as February 2008 when A&S first defaulted on a debt in excess of $55,000 to EASTER UNLIMITED, a supplier, Schedule F in Document 29 in Bankruptcy Case 1:12-bk-10392-VK, United States Bankruptcy Court for the Central District of California, **Trial Exh. 5** and Schedule F, Document 68 in Bankruptcy Case 1:12-bk-10392-VK, United States Bankruptcy Court for the Central District of California, **Trial Exh. 6.**

32. A&S was in balance sheet insolvency by year end 2009.  The company's 2009 profit and loss statement, **Trial Exh. 4,** shows an operating loss of $268,591.

33.  By year end 2010, A&S had unpaid loans in excess of $1,131,710, negative assets approaching $450,000, and no ability to raise credit in the marketplace., **Trial Exh. 4, 5, 6**.

34. By year end 2010, Mr. Weiss' company defaulted on more than $210,000 in sales taxes to the State of California along with numerous other debts. *See* A&S Bankruptcy Schedules E, F, **Trial Exh. 5, 6.**

35. Mr. Weiss' company relied heavily on Halloween and year end holiday sales. By year end 2010, Mr. Weiss knew that his company's Halloween and holiday sales had been materially reduced by an aggressive competitor and that the competitor was continuing to expand in the same marketplace in which A&S operated. *See* Debtor's Disclosure

Statement in Documents 138, 139 in Bankruptcy Case 1:12-bk-10392-VK, United States Bankruptcy Court for the Central District of California, **Trial Exh. C.**

36. Mr. Weiss' repeated statements to Mr. Bredmehl that A&S was prospering and growing in 2011 and his assurances of payment were materially false.

37. When Mr. Weiss described his thriving, expanding business to Mr. Bredmehl in April 2011, he could not have failed to know that his company was failing and had been failing since 2008.

38. On the basis of years of defaulted debts, defaulted loans of more than $1million, unpaid taxes, negative assets, inability to raise credit, and aggressive competition, A&S was a failing company at all times in 2011.

39. Mr. Weiss claims there was a reasonable basis for projecting robust Halloween sales in 2011 on the basis of A&S' historical "per store" average from Halloween sales and an increase in the number of A&S stores. Mr. Weiss' claim is false. The number of stores was falling – not increasing while "per store" revenue was plummeting. **Trial Exh. 4**.

40. Mr. Weiss claims that historical "per store" revenue growth justified an expected revenue increase in 2011 of almost 30% over 2007. That is false. In fact, for the four years following 2007, per store revenue never matched 2007 and in three of the four years failed to approach 2007 revenues. Per store revenue for 2010 plummeted by 30% year over year, from $247,766 to $174,931. **Trial Exh. 4.**

41. Mr. Weiss' company relied heavily on Halloween and year end holiday sales. By year end 2010, Mr. Weiss knew that his company's Halloween and holiday sales had been materially reduced by an aggressive competitor. **Trial Exh. C**. He knew also that this

competitor was expanding in the same marketing area where A&S was engaged in business. **Trial Exh. C.**

### III. PLAINTIFF'S REQUEST FOR RULINGS OF LAW

1. Mr. Weiss' repeated assurances and claims that A&S was prospering and growing, that its business was expanding, that per store volume was expanding, and that the number of stores was expanding were false and inconsistent with facts long known to Mr. Weiss and set out in his own company financial records.

2. Mr. Weiss' repeated assurances of payment were inconsistent with facts long known to Mr. Weiss and are contradicted by his own documents and bankruptcy disclosures. He knew his company was in cash flow insolvency by year end 2008; was in balance sheet insolvency by year end 2009; had unpaid loans in excess of $1,131,710 and negative assets approaching $450,000 in 2010; had defaulted on more than $210,000 in sales taxes to the State of California along with numerous other debts in 2010; and had no ability to raise credit in the marketplace by year end 2010.

3. Mr. Weiss' claim that historical "per store" revenue growth justified an expected revenue increase in 2011 of almost 30% over 2007 is false and inconsistent with facts known to him and contradicted by his own documents and bankruptcy disclosure. In fact, for the four years following 2007, per store revenue never matched 2007 and in three of the four years failed to approach 2007 revenues. And per store revenue for 2010 plummeted by 30% year over year, from $247,766 to $174,931. **Trial Exh. 4, C.**

4. At the time Mr. Weiss solicited purchases from NATIONWIDE and throughout the six month period during which he made purchases and gave assurances to NATIONWIDE, he did not have any reasonable expectation of substantially paying for almost $300,000 in purchases From his own records and on the basis of facts known to him, Mr. Weiss' company had been in cash flow insolvency since year end 2008; was in balance sheet insolvency by year end 2009; had unpaid loans in excess of $1,131,710 and negative assets approaching $450,000 by year end 2010; had defaulted on more than $210,000 in sales taxes to the State of California along with numerous other debts; had no ability to raise credit in the marketplace by year end 2010; had a contracting number of stores; and was faced with an aggressive competitor that had dramatically reduced A&S per store sales in 2010. That competitor was continuing its expansion in the same marketplace in which A&S operated in 2011.

5. Mr. Weiss engaged in a course of conduct of assurances, claims, and representations which were inconsistent with facts long known to him. Misrepresentation by fraudulent pretense or deceit is a violation of G.L. c.93A, §§2, 11and is proved with even a single material statement that *is susceptible of actual knowledge*. Where facts are susceptible of actual knowledge, the Defendant cannot avoid liability by characterizing his statements as mere opinion, judgment, or surmise.  *Powell v Rasmussen*, 335 Mass. 117, 118 (1969); *Evans v Yegen Associates*, 556 F. Supp. 1219, 1227 (D. Mass. 1983). Here, Mr. Weiss' course of conduct is one of repeated misrepresentation by fraudulent pretense or deceit in violation of the statute.

6. Mr. Weiss engaged in deceit and fraudulent misrepresentation in violation of G.L. c.93A, §§2, 11 by making repeated statements, assurances, and claims that were inconsistent with facts long known to him. *Rodi v. Southern New England School of Law*, 389 F. 3d 5, 20 (1st Cir. 2004); *Datacomm Interface Inc. v Computerworld, Inc.,* 396 Mass. 760, 788 (1986); *NPS LLC v Ambac Assurance Corp*., 706 F. Supp. 2d 162, 171 (D.Mass. 2010).

7. Mr. Weiss engaged in deceit and fraudulent misrepresentation in violation of G.L. c.93A, §§2, 11 by making repeated statements, assurances, and claims to secure purchases when there could not be any reasonable expectation that his company would make substantial payment for almost $300,000 in purchases from NATIONWIDE. *Watson v Silsby*, 166 Mass. 57, 59-61 (1896).

8. Based on their long dealings and Mr. Weiss' record of always having made payment for his purchases, *albeit* slowly, Mr. Bredmehl acted reasonably in trusting Mr. Weiss, in having accepted his claims and assurances as accurate, and in extending credit for purchases made in 2011. Rodi , *supra,* 389 F. 3d at 20.

## CONCLUSION

The trial court should find and rule as a matter of law under c.93A, §§2, 11 that NATIONWIDE is entitled to damages from Mr. Weiss in the sum of $237,528.39 plus reasonable attorney fees, costs, and statutory interest as determined by the court. NATIONWIDE is entitled also to multiple damages, as required by c.93A, §11 because Mr. Weiss' course of conduct was willful and knowing. *Kattar v Demoulas*, 433 Mass. 1, 16 (2000).

Respectfully Submitted
NATIONWIDE BOOK INDUSTRIES LLC, Plaintiff
By its Attorneys,


/s/ Edward J Dailey
Edward J Dailey (BBO no. 112220)
SUNSTEIN KANN MURPHY & TIMBERS LLP
125 Summer Street
Boston, Massachusetts  02110
Telephone: 617.443.9292
Fax: 617.443.0004
edailey@sunsteinlaw.com

July 25, 2013


## Certificate of Service

I certify that this document has been filed electronically through the trial court's ECF system. A notice of filing and one copy of this document will be served on all counsel registered by and through the ECF system.

/s/ Edward J Dailey
Edward J Dailey
July 25, 2013
03581/05003  1928911.1