UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATIONWIDE BOOK INDUSTRIES, LLC,<br><br>          Plaintiff,<br><br>v.<br><br>A&S BOOKSELLERS, INC. [a/k/a A&S BARGAIN BOOKS, a/k/a A+S BOOKSELLERS, a/k/a A+S CROWN BOOKS, a/k/a CROWN BOOKS, a/k/a CENTURY CITY/CROWN BOOKS] and ANDREW WEISS,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 1:11-cv-12195-JGD<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT ANDREW WEISS' PROPOSED**
**FINDINGS OF FACT AND RULINGS OF LAW**

## A. FINDINGS OF FACT

1. Defendant Andrew Weiss ("Weiss") is the President of A&S Booksellers, Inc. ("A&S"), a company that operates "pop-up stores," a retail model in which A&S enters short-term leases with retail landlords to fill otherwise vacant retail space with temporary tenants selling Halloween or Christmas merchandise, books, or calendars.

2. Retail landlords enter short-term leases with A&S either on a month-to-month basis or annually with the provision that the lease may be terminated upon 30 days' notice.  The nature of the business involves significant turnover, moving in and out of locations and leases sometimes in a matter of days.  Mr. Weiss estimated that A&S had moved in and out of approximately 300 locations over the 15 years prior to the filing of the A&S bankruptcy.

3.  A&S's business includes both Halloween and bookstore operations; however, the Halloween pop-up store business is the primary driver of profits.  Typically, a Halloween-dependent business such as A & S  earns more than 60 percent of its revenues in the last 10 ten days prior to October 31, and approximately 40 percent of its total season revenues are earned in the last three days prior to October 31.

4.  Weiss and Erez Bredmehl ("Bredmehl") had done business with each other in the past. Those dealings occurred when Bredmehl was the principal of a now-defunct bookselling business which predated Nationwide Book Industries, LLC ("Nationwide").

5.  In their past dealings, Bredmehl had found that Weiss was honest, reliable and straightforward, and though his company was often a slow payer, it had always paid for in orders in full.

6.  In April of 2011 Weiss of A&S and Bredmehl of Nationwide met at a trade show and discussed the possible sale of an assortment of books to A&S. Nationwide is in the business of making bulk sales of discounted older books and other items.

7.  It was agreed between Weiss and Bredmehl that A&S would purchase books form Nationwide for resale in its pop-up stores.

8.  Nationwide never sought or requested Weiss' personal guaranty on orders shipped to A&S.

9.  Pursuant to the agreement between the parties, Nationwide was to determine the exact size of the orders to be shipped and the titles of books to be included therein.

10. Weiss' primary concern addressed to Bredmehl was that he provide a limited number of copies of each title and that he ship a quality assortment of books.

11. Throughout 2011, the contents and size of the book sales to A&S were determined by

Nationwide. A&S only requested that Nationwide ship a good mix of titles and to limit the number of copies of any one title to no more than five. The size of the order and titles to be included were determined by Nationwide.

12. In their discussions, Weiss told Bredmehl that he was optimistic about future sales because of the anticipated Halloween sales season and because the closure of Borders book stores afforded A&S the ability to obtain short-term leases for some of the former Borders prime locations.

13. In Weiss' previous experience, when a national chain of bookstores closed, this presented a significant opportunity for a successful selling season. In one other instance where this had happened in the past, Weiss' business had had an enormously successful year with significantly increased sales and revenues.

14. Weiss made these optimistic predictions in good faith.

15. Bredmehl did not rely on Weiss' statements in determining the size of shipments or whether to ship books to A&S.

16. Bredmehl was not reasonably diligent in determining A&S's credit worthiness.

17. In telephone conversations throughout the April-September time frame, Weiss remained optimistic about A&S's anticipated sales revenue and ability to repay Nationwide. In their discussions, Weiss made clear to Bredmehl that A&S's ability to pay was based upon Weiss' expectation of good Halloween season sales.

18. Bredmehl understood that payment to Nationwide would have to wait for, and was dependent on, a successful Halloween sales season for A&S.

19. On April 7, 2011, Nationwide shipped two orders to A&S, one for $61,105.80 and one for $57,795.20. The size and contents of these orders were determined by Nationwide.

(Exhibits1, pp. NBI00052, 00054)  (Exhibits1, pp. NBI00051, 00053).

20.  Nationwide invoiced A&S for these orders prior to shipment on April 1, 2011, with 90

day payment terms. (Exhibits1, pp. NBI00051, 00053).

21.  On April 5, 2011, Bredmehl emailed Weiss as follows:

Could you schedule with CH Robinson for the first load to pick up this Friday the 8th. If
you could request a 53' footer that would be great.
The contact phone # is Shavit at 617-909-2539
And the pick up address is:
620 South Street Unit C
Holbrook, MA 02343
It will be a full 44,000 lbs load should they need to know upfront.
*I will get you the details of what is on this load shortly*. Thanks Andy!

(Exhibit 3, p. NBI00071) (Emphasis added).

22.  On April 6, 2011, Bredmehl emailed Weiss as follows:

Hope you are well my friend.
*Here is what will be included in the first load*. Depending on the weight and how much
we can safely squeeze in, load 1 will contain:
4 sets of Houghton Trade paper - Each set has 4 skids - 7200 units per set.
4 sets of Houghton Adult Hardcover - Each set has 2 skids - 2000 units per set.
Depending on the "squeeze" factor the kids Hardcover skids also be [*sic*] on the load 1 or
will be part of load 2.
4 sets of Houghton Kids Hardcover - Each set has 3 skids - total units 4500 units per set
4 sets of Houghton kids Paper - Each set has 3 skids - total units 9000 units per set.
Simon trade, Dark Horse, will be included as well.
Each pallet is marked so that you can redirect very easily. Each skids is [*sic*] identified as
Pallet # of #. Store 1, Store 2 Etc and includes the description of the category such as
Trade, Kids HC, Kids PB etc.
*Thanks again for the opportunity*.

(Exhibit 3, p. NBI00072) (Emphasis added).

23. On June 28, 2011, Nationwide shipped two more orders to A&S, one for $47,417.00 and

one for $54,669.00. (Exhibit 1, pp. NBI 00056, 00062)

24. The size and contents of these orders were determined by Nationwide.

25. The order included many more than five titles of each book shipped in contravention of

A&S's request of no more than five copies of each title.

26. These two orders arose in the course of a mid-June[1] telephone conversation initiated by Bredmehl regarding the timing of the payment for the initial two shipments.

27. Bredmehl solicited the mid-June orders from A&S in the course of that telephone conversation.

28. In the mid-June telephone conversation, Weiss, in good faith, expressed continued optimism that Halloween sales would permit payment for the goods being shipped. Weiss indicated that cash flow would not permit significant payment on account of the open invoices until late in the year, based upon his expectations as to sales.

29. Nationwide invoiced A&S for these orders prior to shipment on June 16, 2011 with 90 day payment terms. (Exhibit 1, pp. NBI00055, 00061).

30. On June 28, 2011, the same day as the two June orders were shipped, Bredmehl sent Weiss an email stating the following:

Didn't want to bother you with a phone call but with the first two invoices becoming due this week and next week which amounts to $118,901. *Could you let me know how much and when you plan to send in payments against this balance*.

Just so you know and can plan accordingly, we do accept MC and Visa...no Amex...*if this helps you with your own cash flows* and attached a credit card authorization form should you like to pay via Credit card.

Thanks Sir

(Exhibit 3, NBI00073)  (Emphasis added).

31.  In mid-July, 2011 A&S made a payment of $10,795.20 to Nationwide. That payment was booked by Nationwide on July 20, 2011. (Exhibit 2).

32. A&S made this payment as a show of good faith at the request of Nationwide.

---

[1] The date of the conversation can be inferred from the date of the invoices generated June 16, 2011), which precede the shipment dates. See Exhibit 1, pp. NBI00055, 00061.

33.  In late August A&S made a payment of $5,000.00 to Nationwide. That payment was booked by Nationwide on August 29, 2011. (Exhibit 2).

34. A&S made this payment as a show of good faith at the request of Nationwide.

35.  On September 22, 2011, Nationwide shipped an order to A&S for $43.689.13. (Exhibit1, p. NBI00066).

36. The size and contents of this order were determined by Nationwide.

37. The order included many more than five titles of each book shipped in contravention of A&S's request of no more than five copies of each title.

38. The order arose out of a telephone conversation with Weiss initiated by Bredmehl in mid-September[2] to discuss amounts due from A&S to Nationwide.

39. Bredmehl solicited this order in that telephone conversation.

40. In the telephone conversation Weiss, in good faith, restated that he was still expecting a good Halloween sales season, which would permit repayment of the amounts owed by A&S to Nationwide.

41.  Nationwide invoiced this shipment of books on prior to their shipment on September 20, 2011. (Exhibit1, NBI00065).

42.  On October 7, 2011, Bredmehl sent the following email to Weiss:

Here is another copy of the last invoice... just heard your message. Calling you back in 5 minutes.

Thanks

(Exhibit3, p. AW00002).

43.  On November 4, 2011, Nationwide shipped an order to A&S for $30,773.46. The size and content of this order were determined by Nationwide. (Exhibit1, p. 00068).

---

[2] The timing can be inferred from the date of the invoice (September 20, 2011), 2011) for the later shipped order. Exhibit1, p. NBI00065.

44. The order arose out of a mid-October telephone conversation[3] initiated by Bredmehl to discuss payment of the amounts due to Nationwide by A&S with Weiss.

45. This order not only included many more than five copies of the same book titles, but a plethora of other items and knick-knacks not specifically ordered by A&S.

46. Bredmehl solicited this order.

47. In the telephone conversation Weiss, in good faith, restated that he was still expecting Halloween sales to permit repayment of the amounts owed by A&S to Nationwide.

48. Nationwide invoiced this shipment of books and other items on October 21, 2011. (Exhibit1, p. NBI00067).

49. During October of 2011 A&S made four separate payments to Nationwide totaling $42,086.00. These payments were all booked by Nationwide on October 31, 2011. (Exhibit 2).

50. These payments and A & S's ability to make them were the result of Halloween season sales by A&S.

51. On December 6, 2011 Bredmehl sent the following email to Weiss:

I know you are currently working on a payment schedule to pay off the owed balance by year end but this is what I need done as it is December 6th and haven't seen a partial payment since 10.31.11 despite your assurance that partial payments would have been made on a regular basis.

$50,000 Fedex on 12/9/11
$50,000 Fedex on 12/16/11
$50,000 Fedex on 12/23/11 dated 12/23/11 and a check for the remaining $84,000 to be included but won't be deposited until the 29th of December.

We do accept Mastercard and Visa and have attached a form for your use... no Amex though.

Andy - I am a bit concerned regarding the open balance as I have needed to chase

---

[3] The timing can be inferred from the date of the invoice (October 21, 2011) for the later shipped order. Exhibit1, p. NBI00067.

payments *rather than receiving partial payments on a regular basis as we have discussed* numerous times and seems like the many phone calls did not yield any received payments So again I apologize for reaching out to you but please note the importance and necessity to meet the payment deadline of 12.29.11 for the balance due and owing of $234,000.

I will call you on Thursday or if you like to call me prior, I am always available.

(Exhibit 3, p. NBIO00074) (Emphasis added).

52.  On January 25, 2012 Bredmehl sent the following email to Weiss:

I noticed that you have attempted to call me [*sic*] cell phone a number of times this afternoon (EST). At his point, it is important to communicate through your lawyers. I have cc'd my attorneys in this email.

At this stage, lawyers needs [*sic*] to handle any and all communications.

(Exhibit3, AW00001)

53.   In 2011, A&S's Halloween season sales significantly underperformed Weiss' expectations.

54.  Based on the historical per-store average from Halloween sales and the addition of former Borders store locations, Mr. Weiss had projected a significant increase in A&S revenue by the close of 2011.

55.  Because of weaker than expected revenues A & W was only able to pay Nationwide $57,888.20 on account of the book shipments to it.

56.  This expectation did not pan out and revenues were below those for the prior year.

57.   The 2011 year the actual per-store revenues for A&S were approximately 17 percent lower than any prior year since the company started in 2007, dropping to $145,015 per store.

58.   If the 12 stores operating during the Halloween season in 2011 had per-store revenue consistent with the 2010 average, A&S should have taken in an additional $360,000 in revenues over its actual 2011 revenues.

59.  If the 12 stores operating during the Halloween season in 2011 had per-store revenue consistent with the 2009 average, which was the minimum Weiss expected, A&S would have taken in additional $1,233,012 in revenues more than it actually did in in 2011.

60.   A&S filed a Chapter 11 petition for relief under the Bankruptcy Code in the United States Bankruptcy Court in the Central District of California on January 13, 2012.

61. At the time of the bankruptcy filing A&S owed Nationwide $237,528.39.

62. Weiss' statements to Nationwide regarding his expectations of future sales and particularly Halloween sales were statements of his opinion.

63. When Weiss expressed his optimism regarding his expectations as to future sales and A&S's consequent ability to pay for the books ordered, he was doing so in good faith.

64. Nationwide did not rely on any statement made by Weiss to its detriment.

65. Any reliance by Nationwide on any statements made by Weiss was not reasonable, since Nationwide understood A&S was having cash flow issues.

66. Bredmehl is not credible as to his statements about the assurances he claims Weiss gave him, his reliance on such "assurances," or the reasonableness of such reliance.

**B. RULINGS OF LAW**

**1) Failure to Disclose Financial Difficulties**

1.  Failure to disclose financial troubles, without more, is insufficient to establish fraud as there simply is no duty in the context of a business relationship for one sophisticated party to voluntarily disclose such information to another.  *Lily Transp. Corp. v. Royal Institutional Services, Inc.*, 832 N.E.2d 666, 684, 64 Mass. App. Ct. 179 (2005).

2.  "A business relationship is not transformed into a fiduciary relationship merely because trust was reposed by one party in the other party." *Davidson v. General Motors Corp*., 57

9

Mass. App. Ct. 637, 643, 786 N.E.2d 845 (2003).

3. Liability for intentional nondisclosure does not attach when the parties are sophisticated businessmen dealing at arm's length without any fiduciary relationship. *See Id.;* *Schwanbeck v. Federal-Mogul Corp.*, 31 Mass.App.Ct. 390, 405, 578 N.E.2d 789 (1991), *rev'd on other grounds*, 412 Mass. 703, 592 N.E.2d 1289 (1992) (It is understood that "when parties bargain, each tries to get the best from the trade[, and] [t]hey are in an adversary, not a fiduciary, relationship").

4. An officer of an entity cannot be held personally liable for failure to affirmatively disclose information regarding that entity's finances. *Berkshire-Westwood Graphics Group, Inc. v. Davidson*, 73 Mass. App. Ct. 1128, 903 N.E.2d, 2009 WL 735074 (2009) (memorandum and order pursuant to Rule 1:28) (individual sued personally for fraud after his company entered bankruptcy "had no duty to disclose the full extent of [his company's] deteriorating financial condition").

5. The "restricted circumstances" in which tort liability for intentional nondisclosure may attach are simply not present where the parties were "sophisticated businessmen, active and experienced in the area, dealing at arm's length without any fiduciary or confidential relationships or expectations." *Lily Transp. Corp. v. Royal Institutional Services, Inc.*, 832 N.E.2d 666, 684, 64 Mass. App. Ct. 179 (2005), *citing Swinton v. Whitinsville Sav. Bank*, 311 Mass. 677, 678–679, 42 N.E.2d 808 (1942); *Greenery Rehabilitation Group, Inc. v. Antaramian*, 36 Mass.App.Ct. 73, 77, 628 N.E.2d 1291 (1994); *Wolf v. Prudential–Bache Secs. Inc.*, 41 Mass.App.Ct. 474, 476–478, 672 N.E.2d 10 (1996).

6. The long-established rule in the Commonwealth is that "in the absence of any other fraudulent conduct it would be too strict a rule to hold one guilty of fraud for buying

without the present means to pay, if he has a hope and a purpose to pay, if possible, in the future." *Watson v. Silsby*, 43 N.E. 1117, 1117, 166 Mass. 57 (1896).

**2. Fraudulent Misrepresentation**

7. A fraudulent misrepresentation occurs when a defendant (1) makes a false misrepresentation of material fact, (2) has knowledge of that falsity and (3) has the purpose of inducing a plaintiff to act, and the plaintiff (4) relies upon the misrepresentation as true and (5) acts to her detriment. *Behnam v. Lenox Savings Bank* 26 F. Supp. 2d 231, 236 (D.Mass. 1988).

8. No claim for misrepresentation arises, however, when a statement concerns a "matter of opinion, estimate or judgment." *Id., citing Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1199 (D.Mass. 1990). "When a future event is not substantially within the defendant's control, a defendant's statement about a future event cannot be a misrepresentation." *Id., citing Yerid v. Mason*, 341 Mass. 527, 170 N.E. 718 (1960).

9. Statements which can be fairly characterized as a "kind of general, rosy affirmation," the sort of puffery that "cannot have been material to any reasonable analysis of the company's prospects" do not give rise to liability for fraud. *NPS, LLC v. Ambac Assur. Corp.*, 706 F.Supp.2d 162, 171 (D.Mass. 2010); *see also Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc.,* 976 F.2d 58, 65 (1st Cir. 1992), citing *Kelly Tire Serv. Inc. v. Kelly-Springfield Tire Co.*, 338 F.2d 248, 253 (8th Cir.1964) ("[a]t best, these projections [about plaintiff's business], however persuasive in shaping plaintiff's plans, were opinions subject to the uncontrollable economic influences of free enterprise and not fraudulent misrepresentations of past or existing facts on which plaintiff justifiably relied to its detriment"); *Orton v. Parametric Tech. Corp.,* 344 F.Supp.2d 290,

301 (D.Mass. 2004).  "[V]ague and general statements of optimism ... [and] statements of subjective analysis or extrapolations, such as opinions, motives and intentions or other types of 'soft information' are not actionable". *Payne v. DeLuca*, 433 F.Supp.2d 547, 561 (W.D. Penn. 2006)

10. "A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions." *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997), citing *4 Collier on Bankruptcy*, ¶ 523.08[1][d], at 523-43;  *Elias Bros. Rests., Inc. v. Acorn Enters., Inc.,* 831 F.Supp. 920, 926 (D.Mass. 1993) ("False statements of opinion or belief generally are not actionable.").

11. An actionable misrepresentation "occurs when 'the representation was false and was susceptible of actual knowledge.'"  *Benham v. Lenox Sav. Bank*, 26 F.Supp.2d 231, 237 (D.Mass. 1998), quoting *Roadmaster Indus. v. Columbia Mfg. Co., Inc.,* 893 F.Supp. 1162, 1176 (D.Mass. 1995).

12. "Intent to deceive is a difficult element to establish, and although intent is generally inferred, courts have recognized 'that misconceived optimism is not uncommon to the financially distressed.'" *In re Gonzales*, 187 B.R. 183, 187 (Bankr. N.D. Ohio1995), *citing In re Stewart,* 91 B.R. 489, 495 (Bankr. S.D. Iowa 1988).

13. Reliance on statements of hope or optimistic expectations is not reasonable as is required to establish fraudulent misrepresentation.  *Masingill v. EMC Corp*., 449 Mass. 532, 540-41, 870 N.E.2d 81 (2007), citing *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 467, 781 N.E.2d 787 (2003) (discussing when reliance justified).  *See In re Lernout & Hauspie Securities Litigation,* 286 B.R. 33, 42-43 (D.Mass. 2002) ("vague,

soft statements are not actionable because reasonable investors do not rely on them");

*Saxon Theatre Corp. of Boston v. Sage,* 347 Mass. 662, 667, 200 N.E.2d 241, 244 (1964)

(complaint did not make out a case for deceit because any reliance on alleged false

representations would not be reasonable); *Hogan v. Riemer*, 35 Mass.App.Ct. 360, 365,

619 N.E.2d 984 (1993); *Commerce Bank & Trust Co. v. Hayeck*, 46 Mass.App.Ct. 687,

692, 709 N.E.2d 1122, 1126 (1999); *Mahaney v. John Hancock Mutual Life Ins. Co.*, 6

Mass.App.Ct. 919, 920, 380 N.E.2d 140, 141 (1978) (unreasonableness of reliance is a

complete bar to liability for deceit).

14.  A creditor "can hardly be heard to complain about a debtor's implied misrepresentations

concerning his ability to pay and its reliance thereon if it neglected to conduct some

inquiry regarding the debtor's ability to pay." *In re Chech*, 96 B.R. 781, 784 (Bankruptcy

Court, N.D. Ohio 1988).

15.  "A plaintiff may not blindly rely upon a misrepresentation, the falsity of which would be

obvious to the plaintiff had he or she used her senses to make a cursory examination or

investigation. '[O]nly where, under the circumstances, the facts should be apparent to [a

person of the plaintiff's] knowledge and intelligence from a cursory glance, or where [the

plaintiff] has discovered something that should serve as a warning that he is being

deceived, ... is [the plaintiff] required to make an investigation of his own.'. Justifiable

reliance turns upon the plaintiff's own capacity and knowledge, or the knowledge with

which the plaintiff may be fairly charged to have from the facts within his or her

observation in light of his or her individual case." *In re Sharpe*, 351 B.R. 409, 423

(Bankr., N. D. Texas 2006), citing *Field v. Mans*, 516 U.S. 59, 61, 116 S.Ct. 437, 133

L.Ed.2d 351 (1995).

16. Hope is not enough to support reasonable reliance. *Hall v. Horizon House Microwave, Inc.*, 24 Mass.App.Ct. 84, 94 (1987) (discussing reasonable reliance in context of promissory estoppel).

## 3.  M.G.L. c. 93A, § 11

17.  "A practice is unfair if it is 'within ... the penumbra of some common-law, statutory, or other established concept of unfairness; ... is immoral, unethical, oppressive, or unscrupulous....'" *Blue Hills Office Park LLC v. J.P. Morgan Chase Bank,* 447 F.Supp.2d 366, 376 (D.Mass. 2007), *quoting Linkage Corp. v. Trustees of Boston Univ.,* 425 Mass. 1, 27, 679 N.E.2d 191 (1997).  Businesses seeking relief with respect to unfair or deceptive acts are held to a stricter standard than consumers in terms of what constitutes unfair or deceptive conduct. *Giuffrida v. High Country Investor, Inc.*, 897 N.E.2d 82, 73 Mass.App.Ct. 225 (2008), *rev. denied* 901 N.E.2d 138, 453 Mass. 1103. However, "[a] mere breach of contract does not constitute an unfair or deceptive trade practice under 93A, unless it rises to the level of commercial extortion or a similar degree of culpable conduct." *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.,* 217 F.3d 33, 40 (1st Cir. 2000) (internal citations and quotations omitted*); Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 583 N.E.2d 806, 822 (Mass. 1991) (for a c. 93A violation to exist more than a simple breach of  contract is required).

18. Where a claim under Chapter 93A arises entirely out of an alleged misrepresentation claim, a plaintiff must establish reasonable reliance or the Chapter 93A claim fails as a matter of law.  *Ruggers, Inc. v. U.S. Rugby Football Union, Ltd.*, 843 F.Supp.2d 139, 147 (D.Mass. 2012), *citing Trifiro v. N.Y. Life Ins. Co.*, 845 F.2d 30, 33, n.1 (1st Cir.1988) ("[A] violation of [Chapter] 93A require[s] reasonable reliance by the petitioner").  More

14

broadly, a Chapter 93A claim must fail where an underlying common law violation fails as a matter of law.  *See Pembroke Country Club, Inc. v. Regency Savings Bank, F.S.B.*, 62 Mass. App. Ct. 34, 40-41, 815 N.E.2d 241, 247 (2004). *See also FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 108 (1st Cir. 2009).


Respectfully submitted,
ANDREW WEISS,
By his attorneys,

/s/  Krista L. Hawley
Richard E. Gentilli, BBO #189080
reg@bostonbusinesslaw.com
Krista L. Hawley, BBO #663926
klh@bostonbusinesslaw.com
Bartlett Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA  02110
Tel. (617) 422-0200
Dated: July 29, 2013                    Fax. (617) 422-0383


## CERTIFICATE OF SERVICE

I hereby certify that the above document was filed electronically on July 29, 2013 utilizing the court's ECF system. A notice of the filing of the document was sent by the court's ECF system to all counsel of record who are registered users of the court's ECF system, who may then access the document through the court's ECF system. In addition, I certify that a copy of the foregoing document was served by mail on any attorney of record or pro se party who is not registered to receive electronic filing, as indicated on the Notice of Electronic Filing issued by the court's ECF system.

/s/  Krista L. Hawley
Krista L. Hawley