UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NATIONWIDE BOOK | ) | |
| INDUSTRIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | NO. 11-12195-JGD |
| | ) | |
| ANDREW WEISS, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND RULINGS OF LAW

October 21, 2013

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action arises out of a series of purchase orders under which the plaintiff,

Nationwide Book Industries, LLC ("Nationwide"), agreed to sell more than 216,000

books to the defendant A&S Booksellers, Inc. ("A&S").[1]  Nationwide claims that it made

its initial sales to A&S, and continued to ship books to A&S, based on repeated

assurances from A&S' principal, defendant Andrew Weiss, that A&S' business was

prospering and that payment to Nationwide would be made in full.  It further claims that

Weiss' representations were false, and were made only as a pretense to obtain books from

the plaintiff without paying for them.  By its Complaint, Nationwide has brought claims

against A&S for breach of contract (Count I) and unfair and deceptive business practices

---

[1]  A&S Booksellers, Inc. has done business under various names, and each "a/k/a" has
been listed in this action.  They will be referred to collectively herein as "A&S."

(Count II).  It has also asserted a claim against Weiss for fraudulent pretense and deception, by which A&S is seeking to hold Weiss personally liable for A&S' debt under Mass. Gen. Laws ch. 93A (Count III).  On January 13, 2012, A&S filed for Chapter 11 bankruptcy, as a result of which Nationwide's claims against that defendant are currently stayed.

A jury-waived trial of Nationwide's claims against Weiss was held before this court on August 12, 2013.  Weiss and Erez Bredmehl, the principal of Nationwide, testified.  After careful consideration of the testimony, exhibits, pleadings and arguments of the parties, this court finds that Nationwide has failed to meet its burden of proving that Weiss acted with fraudulent intent when he ordered the books, or that Weiss made actionable misrepresentations of fact.  In addition, Nationwide has not met its burden of proving that its reliance on Weiss' representations was reasonable.  Therefore, and for the reasons detailed herein, judgment shall enter in favor of Weiss on Nationwide's claims against him.

## II.  FINDINGS OF FACT

### The Parties

The plaintiff, Nationwide, is a small Massachusetts LLC engaged in the wholesale purchase, sale and distribution of overstock and remainder books and other media products.  Its principal owner is Erez Bredmehl, who opened Nationwide in 2009.

Bredmehl has been in the business of buying and selling remainder and bargain books since approximately 1994.  Prior to starting Nationwide, Bredmehl had operated a

similar business under the name "Strictly by the Book."  That company had gone out of business.

The defendant, Andrew Weiss, was the president and sole owner of A&S, a company which operated "pop-up stores."  Under this business model, A&S would enter into short-term leases with retail landlords to temporarily occupy vacant retail space.  Although the leases were short-term, they could be renewed and on occasion the "temporary" occupancy could last for years.

A&S bought overstock, returns and remainder books and related merchandise from sellers such as Nationwide.  It then sold the merchandise in its "temporary" bookstores at a deep discount.  A&S also operated pop-up stores which sold Halloween and related merchandise.

The Halloween business was highly seasonal, with as much as 40% of its revenue being generated in the few days preceding Halloween.

Weiss had first started to sell books under this pop-up model in the 1990's.  At some point early on he purchased the inventory of Crown Books, a company which had gone out of business.  Weiss had opened approximately 13 pop-up bookstores in retail space vacated by Crown Books, as a result of which his revenues had doubled.  Weiss operated these bookstores under the name Crown Books and later A&S (or related names).  Eventually, his use of the name Crown Books was discontinued.  A&S added the Halloween business in or around 2007.

A&S filed for Chapter 11 bankruptcy in January 2012.  Weiss continued to work for the company until January 2013, at which time the company went into liquidation. Weiss' wife purchased the abandoned inventory of A&S, and started a business which appears to be substantially identical to A&S' business.  She is operating under the name Crown Books, and Weiss is "advising" her in connection with running the business.

Weiss and Bredmehl (when he was running Strictly by the Book) started doing business together in or about 1997.  According to Bredmehl, Weiss was "always a man of his word" and someone he could trust.  (Tr. 122).  Weiss had always paid his bills in full, albeit slowly and with partial payments until paid in full.

### Events Leading to the First Purchase Orders

Weiss and Bredmehl met at a book trade show in Atlanta, Georgia in March 2011, where Nationwide was exhibiting and Weiss had gone to purchase inventory for A&S. At that time, Borders had recently announced that it would be closing a number of its stores, and the closure was a subject of conversation at the trade show.

At that time, Nationwide was still a new business, and Bredmehl was investing his own money in the company to make it operational.  For his part, Weiss testified that although the book business had gotten "very slow" for him by 2011, and his focus was on Halloween costumes, he saw the recent announcement that Borders was going to be closing stores as a great opportunity to open pop-up book stores in some of these locations.  (Tr. 13).  This had been a very successful business model for him when Crown Books had gone out of business.

-4-

As noted above, Bredmehl and Weiss knew each other from prior transactions. They verbally agreed that Nationwide would sell, and A&S would buy, books for resale in its existing and anticipated bookstores. Bredmehl understood that Weiss needed product for existing stores, as well as for future stores that he planned on opening in Borders' locations.

Bredmehl testified as follows regarding the alleged representations made by Weiss at the trade show. These are some of the representations that form the basis of his claim of fraud:

> Q.   Once you were beyond the stage of pleasantries and the like, what was the nature of your discussion with Mr. Weiss at that trade show?
>
> A.   Mr. Weiss was sharing with me the success of A&S Booksellers, past tense, present tense, and future tense in regards to the prosperity and the growth of his company; and that's why he's at a trade show, looking for book deals.
>
> Q.   If you remember, what did he say to you with respect to the financial condition of his company in terms of growth prosperity?
>
> A.   We weren't discussing numbers, but the story line is what counted, and that's where he had my blessings, if you will, through his story line that A&S Book is doing great, it's doing well, it has a number of prospects for growth. That was the essence of the conversations.
>
> Q.   What was said with respect to Borders?
>
> A.   Borders I believe filed in Chapter 11 in February of 2011. He did find that there would be potential on the real estate market for stores to become available and taking over Borders Bookstores, or at least its locations.
>
> Q.   What did he say, if anything, with respect to his need for inventory from your company or others that were wholesale booksellers?

A.      Well, through the conversations, he had an existing book business, retail business, and so he needed product for those stores; also needed product for stores that he was putting online that were already materialized in regards to real estate dealings, and that was the essence of the April conversations in regards to the orders.

(Tr. 123-24).  As detailed below, this court finds that these statements do not rise to the

level of actionable misrepresentations of fact.

Weiss testified that he told Bredmehl that he hoped to get six to ten Borders stores,

although, as Bredmehl knew, he had not acquired any locations at the time of the trade

show.  He testified further that he expected to have four to six stores running during the

summertime, although he was only ordering inventory for four stores.  In fact, A&S did

open several bookstores during the summer and had four to six stores open by year end.

Bredmehl never did a credit check on A&S or Weiss, and never asked Weiss for a

personal guarantee of any payment.  Bredmehl knew from experience that although A&S

eventually paid its bills in full, it often made only partial payments for inventory, paid

late, and needed to use its credit cards to gain time to make payments.

Bredmehl and Weiss had general discussions about the mixture of books

Nationwide would sell to A&S, including the optimal number of each title to be sold per

store.  It is undisputed, however, that Nationwide was free to set the amount of books

being sold to A&S, and the actual composition and distribution of titles in each order.

Bredmehl and Weiss agree that they discussed payment terms, although their

description of that conversation varies greatly.  Bredmehl testified that he proposed

payment terms of 30 days, but Weiss said that he needed longer since he would be

-6-

opening new stores, and asked for net 90 days.  According to Bredmehl, he reluctantly agreed to 90 day terms.

Weiss testified that although Bredmehl requested payment terms of 90 days, he told Bredmehl that payment would be made after Halloween.  According to Weiss, payment was to be made from the income from his Halloween store sales, and that until that time money would be put into buying inventory for the existing and new stores.

Bredmehl denies that there was any conversation about payment being tied to Halloween at this initial meeting.  He does admit, however, that the Halloween business was at least mentioned by Weiss.  As detailed below, it is undisputed that at least by September 2011, there were conversations relating to payments being made after Halloween.

I find that while Weiss may have informed Bredmehl that most of A&S' income would be available to pay for inventory after Halloween, there was never any agreement reached that no payment would be made for the book inventory until after Halloween. Rather, I find, based on the parties' actions and statements detailed below, that Bredmehl expected that at least some significant payments would be made within 90 days, and that Weiss understood that A&S was expected to make significant payments for the inventory within 90 days.  For example, as detailed below, both Bredmehl and his wife repeatedly asked Weiss for payment around 90 days after the shipment of books, and well before Halloween.  In addition, Weiss authorized various payments before Halloween.  This is strong evidence that all the parties expected that payments would be made before

Halloween.  I further find, however, that Bredmehl was prepared to engage in business with A&S despite knowing, based on his experience, that A&S was unlikely to make payments in a timely manner, and that A&S was dependent on current cash flow to pay its bills.

### The April Orders

At the book trade show, Weiss and Bredmehl agreed to two shipments of books. Bredmehl prepared two invoices dated April 1, 2011.  The first (No. 1021) was for $61,105.80 and indicated a ship date of April 7, 2011 with payment terms "N90," i.e., net 90 days.  (Ex. 1).  The second invoice (No. 1022) was for $57,795.20 and indicated a ship date of April 12, 2011, with payment terms net 90 days.  (Ex. 1, Ex. 2).  The orders were shipped in or around April 7, 2011.

Nationwide established the size of the orders and the composition and distribution of titles in each shipment.  While Weiss testified that he had some concerns about the large size of the shipments, and the mixture of books therein, it is undisputed that A&S accepted all the books and that A&S was responsible for paying for the books.

A&S never submitted any formal purchase orders to Nationwide.  Rather, Nationwide described the contents of the shipments in the shipping invoices, which were mailed to A&S at the same time as the books were shipped.

Weiss and Bredmehl had a telephone conversation in mid-June 2011, after which Nationwide generated two new orders reflected in invoices dated June 16, 2011.  (See Tr. 98).  While, as detailed below, the parties' accounts of this conversation differ, even

accepting Bredmehl's version as true, the statements attributed to Weiss do not rise to the level of actionable misrepresentations of fact.  Moreover, Bredmehl's testimony confirms Nationwide's willingness to do business with A&S despite its knowledge of A&S' current inability to pay its invoices.

Weiss testified that he called Bredmehl in mid-June to complain about having received too many of the same title.  Weiss also testified that he told Bredmehl during this conversation that cash flow would be too tight for him to pay before Halloween, and that he was not eager to buy more books since he had only opened two stores, and was concerned about getting too much inventory too soon.  However, according to Weiss, Bredmehl told him not to worry, and indicated that he might be able to give Weiss a credit if he was stuck with inventory so Weiss was willing to buy more inventory.  Weiss also testified that A&S did agree to pay something on account, although he told Bredmehl it would be hard.

According to Bredmehl, however, "the nature of the conversation [with Weiss] was about prosperity and growth and that he needed more product."  (Tr. 130).  Specifically, Bredmehl testified as follows:

> Q.  Okay. And were you placing these orders in June under essentially the same terms in terms of the selection of books and titles, et cetera?
>
> A.  To a degree, yes.  Andy suggested he was doing very well with the product from the first two truckloads shipped in April.  If you note, the ISMN/EAN SKU number, if you will, are repeat assortments from the previous two orders.

Q. Okay, okay.  Now, let me ask you this: With respect to these two invoices that you prepared and shipped in June, one for $35,000 and one for $20,000, that's over $50,000.  Why did you ship these orders, given that the first two orders hadn't been paid for?

A. The first two orders were not due yet.  The relationship that I had with A&S Booksellers, with Andy Weiss, was one of trust.  High credit at those levels was never of concern before.  He always made partial payments, always paid via credit card was his preference; but there was no alarm bells, so there was no reason not to.

(Tr. 130).

Thus, both parties agree that the mid-June conversation led to additional books being sold by Nationwide, and that Nationwide was prepared to ship these additional orders without payment on the outstanding April invoices and with knowledge of A&S' slow and erratic payment practices.  The court does not need to reconcile any other differences in the testimony.

## The June Invoices

Following the parties' mid-June telephone call, Nationwide generated two more invoices dated June 16, 2011, one with a ship date of June 16, 2011 (No. 1248), and one with a ship date of June 28, 2011 (No. 1249).  (Ex. 1).  Both reflected payment terms of net 90 days.  The first invoice was for $47,417.00 worth of merchandise, while the second was for $54,669.00.  (See Ex. 2).  According to the bills of lading, both of these shipments were shipped on June 28, 2011.  (Ex. 1 at NBI 56, 64).

On the date the shipments were made, June 28, 2011, Bredmehl sent Weiss an email with the subject line "Payment schedule."  (Ex. 3 at NBI 73).  As Bredmehl wrote:

-10-

> Didn't want to bother you with a phone call but with the first two invoices becoming due this week and next week which amounts to $118,901.  Could you let me know how much and when you plan to send in payments against this balance.
>
> Just so you know and can plan accordingly, we do accept MC and Visa … no Amex … if this helps you with your own cash flows and attached a credit card authorization form should you like to pay via Credit card.

(Id.).  At trial, Bredmehl testified that this email was intended to memorialize Weiss's agreement, allegedly made in the June conversation, to make an advance payment on the April invoices, which were not yet due.  I do not find this testimony credible.  As an initial matter, the language used is fairly read as asking when Weiss will make at least partial payments on the invoices which are due shortly; it does not reflect a request that payments be made before the April invoices were due.  Moreover, an early payment is inconsistent with the parties' prior interactions, and there is nothing in the record which would support the conclusion that Weiss was in the habit of making payments before they were due.  On the other hand, the language used is also inconsistent with Weiss' testimony that Bredmehl had agreed to wait until Halloween for payment.  Rather, it seems clear that Bredmehl was still hoping that Weiss would pay his bill in full eventually, but was prepared to proceed on the understanding that there would be partial, late payments.[2]

---

[2]  The language of the email is also inconsistent with an affidavit Bredmehl had filed with the court in which he attested that in his mid-June 2011 conversation, Weiss "promised me that full payment was forthcoming on the outstanding April invoices, and he placed two new orders." (See Tr. 147).  This June 28 email, sent 12 days or so after the mid-June conversation, does not

As noted above, the next two shipments were made on June 28, 2011.  There is nothing in the record that indicates that Bredmehl could not have awaited receipt of at least some payment before shipping additional goods.  Nor is there anything in the record that indicates that he could not have reduced the size of the order in the absence of any payment.  Moreover, as evidenced by the email, the shipments were made even though Bredmehl believed that only partial payments were likely to be made, the payments were going to be late, and that A&S did not have sufficient cash on hand to pay the invoices.

No payments were made in response to the June 28, 2011 email.  Bredmehl testified that he had his wife call Weiss to inquire about payment of the April invoices during the first week of July 2011.  Bredmehl himself called the next day.  Weiss testified that he told both of them that he would not be paying until after Halloween.  Bredmehl denies this.  As Bredmehl describes the conversation:

> Q. And what was the response from Mr. Weiss when you asked him about having failed to make payment?
>
> A. Sure.  Mr. Weiss gave me plausible and reasonable business reasons; that because of his expansion, because of his growth, it was absorbing a lot of his liquidity.  And because he delayed some of the store openings, it did not yield to the cash that he believed he would have at that time, but mainly because he's opening other stores, and that week would fall into a payroll week that would absorb the liquidity.

support the contention that Weiss had said he would be paying the invoices in full in the near future.

Q.      Let me ask you this:  When he's talking about stores, is he telling
        you he's opening Halloween stores, or is he talking about
        bookstores?

A.      It's bookstores.

Q.      Okay.  So he gave you some explanation as to cash flow issues.
        What arrangement or agreement did you reach with him concerning
        these first two payments which were now overdue?

A.      Based on the historical experience with their account, this was not
        anything out of the ordinary or course of business.  It was typical for
        A&S Booksellers to by an extra week in terms or two and yield in
        partial payments as the invoice is becoming due.

(Tr. 132-33).  Again, as explained below, there is nothing in the statements attributed to

Weiss that constitute an actionable misrepresentation of fact.

On July 20, 2011, A&S made a payment of $10,795.20 on account.  This was

applied to the $57,795.20 invoice of April 1, 2011.  (Ex. 2).  No further payments were

made until August 29, 2011, at which time A&S made a payment of $5,000 which was

applied to the fourth invoice of June 16, 2011.  (Ex. 2).

I find that these payments are evidence that A&S had intended to pay the invoices

when it accepted the shipments.  Otherwise, there would be no reason to have made

partial payments.

Bredmehl testified that he had several phone conversations with Weiss in the July,

August and September time frame, but "the payment amounts never yielded to what was

discussed, so there would always be a follow-up to the conversation: "'By the way, you

said X. I got Y.'"  (Tr. 133).  As noted above, however, the only two partial payments

received were one in July and one in August totalling approximately $16,000.00.  As detailed below, this court finds that even accepting Bredmehl's testimony as true, his reliance on repeated broken promises was unreasonable as a matter of law and fact.

## The September Invoice

Despite the lack of partial payments and the fact that invoices were overdue, it is undisputed that Bredmehl called Weiss in September 2011 and initiated the sale of Disney plush toys with books attached.  Following that call, Bredmehl put together a shipment, with an invoice dated September 20, 2011 (No. 1458) for merchandise totaling $43,689.13.  (Ex. 1).  Payment terms were net 90 days, and shipment was made on September 22, 2011.  (Ex. 1 at NBI 66).

With respect to this order, Bredmehl testified as follows:

Q.     That's another sizeable order for almost $44,000.  On what basis did you enter into this transaction, given that the net 90 days is long gone and there has been such little payment?

A.     Again, I was one that would always follow up in the conversation. Many times Mr. Weiss would return the phone call, but it was my way of assessing analytically through conversation and questions to identify the nature and the well-being of A&S, though the payments that were promised, assured, never did come through.

Q.     Right, but here you are in September, you're making another order. I mean, you're increasing an already sizable debt.  What led you to do that?

A.     Andy was very convincing that things are coming together; all the stores are producing.  Andy would share quarter of a million dollars a week in sales between a number of stores; but only in September did he now add to the story line that Halloween stores are coming into play, and it will yield millions and millions of dollars in

-14-

> revenue, and assured me that not only would the bookstores, the
> Halloween stores is just cream on top.  And so I had assurance that I
> needed and comfort for the relationship I had with Andy for many,
> many years, which was a trusting one.

(Tr. 135-36).  Again, this court finds that Weiss' alleged statements of hope for future

sales do not rise to the level of actionable misrepresentations of fact.  Moreover, while

Weiss purportedly made generalized statements concerning anticipated income, there

does not seem to be any discussion about the company's outstanding liabilities to all of its

creditors.

No payments were made in September either before or after the September 22,

2011 shipment.

### The October Invoice

Bredmehl spoke to Weiss on or about October 14, 2011.  According to Bredmehl,

during this conversation Weiss gave him "enough assurances and comfort that the

relationship and the payable is fine."  (Tr. 163-64).  Thus, according to Bredmehl, Weiss

told him "that partial payments would be continuous, and a hundred percent of all

invoices would be paid by 12/31."  (Tr. 166).  Again, these alleged promises were not

fulfilled.

According to Weiss, he remained optimistic about the company at this time.  He

told Bredmehl that he did not know how things would actually turn out until after

Halloween "because seasonal business happens at the very end and it's very nerve-

wracking before that."  (Tr. 104).  He further told Bredmehl that he knew he owed him a

lot of money "but Halloween is coming, and, you know, it's worked the last five years, so I have confidence."  (Tr. 104).  I find Weiss' description of this conversation to be credible.  Moreover, I find that Bredmehl, who had admitted discussing Halloween sales with Weiss in September, was also willing to assume that A&S would end the season with enough to pay its bills.  However, I further find that Weiss was not guaranteeing payment, he was just hoping that things would turn out well.  Bredmehl shared that optimism.

Bredmehl had merchandise he wanted to sell to A&S and Weiss believed he could use it for the upcoming Christmas season.  Thus, while Weiss was "willing" to buy inventory, he wasn't actively pursing it.  (Tr. 104).  I find that Bredmehl initiated the sale of products in October 2011 despite A&S' significant outstanding balance.

On October 21, 2011, Bredmehl issued another invoice (No. 1544) for merchandise worth $30,733.46.  (Ex. 1).  This invoice called for payment net 60 days, i.e., by year end December 31, 2011.  (Ex.1).  This merchandise included mostly children's products.

According to Bredmehl, Weiss had promised two payments a week, but they were not forthcoming.  Rather, on or about October 31, 2011, Halloween, Bredmehl booked a total of four payments in the amount of $7,000, $14,669.00, $10,417.00 and $10,000.00, which had been made during the month of October.  (Ex. 2).  The record is unclear as to when the payments were made.  Nationwide shipped the merchandise from the October 21, 2011 invoice on November 4, 2011.  (Ex. 1 NBI 68).  The shipment was made even

though Halloween had passed, and A&S still owed approximately $200,000 to Nationwide.

### Post-Halloween Events

I find that Weiss was always confident that he would be able to pay Nationwide. The year before, the bulk of the company's income came in September/October, and he thought the same would happen this year.  In Weiss's experience, the company could earn 40% of its revenue in the last three days before Halloween.  He felt that the usual revenue, plus the amounts from the new Borders stores, would make for a very successful year.

However, in November 2011, after Halloween, Weiss realized that he was "going to have a big problem paying my bills" and he called Bredmehl.  (Tr. 103).  Both Bredmehl and Weiss were shocked.

Weiss testified that he was "scrambling" and "had no idea what to do" in November.  (Tr. 109).  A bank line of credit that A&S had applied for had not come through. This, compounded with other debt, "all piled up" and he "realized I wasn't going to be able to make my payments."  (Tr. 109)

According to Weiss, he had given vendors post-dated checks in connection with his orders of  merchandise for the Halloween season, and all the checks were cashed.  In addition, the per store sales were much weaker than expected.  While the stores had never done under $167,000 per store even in difficult years, in 2011 revenue sales were down

to about $146,000 per store.  (See Ex. 4 at 8;[3] Tr. 108).  Although Party City had been a competitor in earlier years in the Halloween business, Weiss had underestimated its impact on A&S' sales in 2011.

A&S did not make any additional payments in November.  On December 6, 2011 Bredmehl sent Weiss an email stating that while he knew that Weiss was "currently working on a payment schedule to pay off the balance by year end" he needed the full amount paid by the end of December.  (Ex. 3 at NBI 74).  Bredmehl said that he was concerned since he had not seen any partial payment since October 31, 2011, "despite your assurance that partial payments would have been made on a regular basis."  (Id.).

No further payments were made.

### A&S' Financial Condition

It is Nationwide's contention that Weiss knew or should have known that A&S had been insolvent since 2009 when he represented to Bredmehl in 2011 that his business was "prosperous, growing, and expanding so to induce purchases" from Nationwide.  (Pl. Mem. (Docket No. 49) at 1).

Weiss contends that A&S was unable to make the payments because its per store sales, particularly of Halloween merchandise, were considerably less than he anticipated, and that A&S was unable to expand as rapidly and as successfully as he had anticipated in the Borders stores.

---

[3]  Page citations in Exhibit 4 are to the pages of Document 23-1 as docketed in this case, excerpts of which were introduced as Exhibit 4.

I find that Nationwide has failed to establish that Weiss knew or should have known that A&S would be unable to pay for the books when he ordered the books from Nationwide at the book trade show in March 2011 or throughout the year.

While a detailed audit of A&S' books and records may have shown that the company was in financial straights, Nationwide has failed to establish that Weiss' projections were so unrealistic that he could not reasonably have relied on them. Perhaps even more significantly, Nationwide has not established that if A&S had met its projections there would not have been sufficient assets to satisfy the debt to Nationwide.

I find that when Weiss met with Bredmehl at the trade show in March 2011, Weiss believed that A&S was a viable company with a bright future. The financial information available to him did not obviously challenge that belief. For example, A&S had filed its 2009 income tax forms on June 23, 2010. (Ex. 9). These income tax forms show that the company had gross receipts of close to $2.8 million, and net business income of close to $140,000.00. (Id.).

Since A&S was a subchapter S corporation, the income was reflected in the Schedule K-1 distributed to Weiss as the sole shareholder of A&S. Thus, Weiss would have paid taxes on the income from A&S.

Weiss understood that all vendors and taxes of A&S had been paid in 2009.[4]

---

[4] This court accepts as true the explanation that the trade debt owed to Easter Unlimited Inc. was incurred in 2011, and that its listing as a 2008 debt in some bankruptcy filings was a typographical error.

I find credible Weiss' testimony that at the time of the book trade show in March 2011, he believed that A&S had been profitable in 2009.

A&S had filed its 2010 income tax forms on February 24, 2011.  (Ex. 10).  These income tax forms show that the company had increased its gross receipts to close to $3.4 million, but that it had a net business income loss of approximately $36,000.  (Id.).

I find credible Weiss' testimony that given the great expansion of the company from 8 stores in 2009 to 14 stores in 2010, he still felt that the "small loss" "wasn't a big problem," and he still felt "optimistic."  (Tr. 41).

I further find credible Weiss' testimony that he was optimistic that sales would increase significantly in 2011 given the opportunities to rent some of the Borders' locations.  Weiss anticipated that revenues would increase to $4 million with additional Halloween and Borders stores.  Weiss' optimism is evidenced by the fact that Weiss personally loaned the company money in 2010 and 2011 (the exact amount of which is in dispute).  I find that he would not have loaned A&S money if he thought that the company was not going to be viable in 2011.

Nationwide argues that A&S was insolvent during the years 2009, 2010 and 2011, relying in support of this claim on Exhibit 4, which contains A&S' Balance Sheet and Profit and Loss Statements for the years ending 12/31/07-12/31/11.  However, as detailed herein, although Weiss failed to disclose this fact during discovery, Exhibit 4 did not exist prior to the bankruptcy filing in 2012 and contains information which was not available to Weiss during his transactions with Nationwide.  Moreover, much of the

information contained in A&S' financial records was consistent with Weiss' belief that A&S was a viable, profitable company.

During discovery, Weiss identified Exhibit 4 as the financial information of the company, and Nationwide believed that Weiss had the information contained in Exhibit 4 available to him at the time he was ordering books in 2011. At trial, however, it became clear that Ex. 4 consisted of restated financial information which had been created in 2012 in connection with the bankruptcy filing.[5] In particular, after Halloween 2011, when it became clear that the company had not generated enough money to pay its bills, an audit was done to determine how the company could be in such dire straights. The 2011 audit established that the amount of inventory had been overstated in earlier years. As a result, earlier financial data portrayed the company as being healthier than it was.

In light of this finding, A&S' financials had to be restated. Due to tax regulations, instead of being able to spread the recently identified loss over several years, the loss had to be taken only in 2009 and 2010. Consequently, as restated, those years reflect significant losses. This restatement, however, does not negate the fact that the vendors were,

---

[5] I find credible Weiss' testimony that this information was calculated in or around the time of the bankruptcy and was not known to him when he was ordering books from Nationwide. It is clear from Exhibit 4 that the document itself could not have existed at the time of the trade show, since it covers the period through December 31, 2011, and refers to "pre-petition sales tax," an obvious reference to the bankruptcy filing. Moreover, while Exhibit 4 shows a net loss of more than $250,000 in 2009, Weiss' income taxes reported the net income from the company that year of $140,000.00. It makes no sense that Weiss would have reported taxable income while knowing that the company was operating at a loss.

for the most part, paid in 2009 and 2010.  Thus, the restatement is not inconsistent with this court's finding that Weiss believed that A&S would be able to pay for the inventory A&S ordered from Nationwide.

Even ignoring the recalculation of inventory values, Nationwide points to several "red flags" reflected in A&S' financials, which were known to Weiss, and which Nationwide contends should have put Weiss on notice that the company was not viable as of 2011.

This court finds that a review of the company's financials (Ex. 4) shows that while there was some financial information which could have put Weiss on notice that the company was having financial difficulties, the issue is not clear cut.  There is also information contained in Exhibit 4 from which the conclusion could be drawn that the company would be able to satisfy its debts to Nationwide.

For example, even with the restatement, the company's current assets exceeded its <u>current</u> liabilities for all the years ending December 31, 2007 through December 31, 2011.  (Ex. 4 at 5-7).  Similarly, the company's income exceeded its <u>current</u> liabilities for all years.  (Ex. 4 at 8, 6).  Thus, this financial information does not establish that Weiss knew or should have known that A&S' income stream was insufficient for it to pay for the books it ordered from Nationwide in 2011.

This is not to say that the picture was entirely rosy when the orders were made.  In 2010, A&S borrowed over $450,000 from individuals other than Weiss.  (Ex. 4 at 6).  In 2011, A&S borrowed approximately $60,000 more from two individuals.  (<u>Id.</u>).  In

addition, fourth quarter sales taxes from 2010 in the amount of approximately $160,000 remained unpaid in 2011.  (Id.).  Some rent was also overdue.  (See Ex. 5).  A&S' application for bank financing, which was to replace the personal loans, was turned down in 2011.

Nevertheless, it remains the fact that (even as restated) the current assets of the company exceeded the current liabilities of the company in the years which preceded A&S' business with Nationwide.  Most of the vendors from 2010 were paid in full.  (See Ex. 5).  There is no evidence in the record that the individuals who had loaned the company money were to be paid before vendors, so the existence of the debts to individuals is insufficient to establish that A&S should have known that it could not pay for the inventory when the orders were placed.  In sum, this court does not find that Weiss knew or should have known that A&S was insolvent when it engaged in business with Nationwide.

Similarly, Nationwide has failed to establish that Weiss' projections were unrealistic when made.  No evidence was submitted to the court concerning either the market in which A&S operated, or the way that A&S operated.  There is no basis for this court to find that Weiss knew or should have known that the bankruptcy of A&S was inevitable at the time A&S engaged in business with Nationwide.

The record establishes that A&S had operated fairly successfully for many years, although it always had a cash flow problem.  Bredmehl knew or should have known that A&S was unable to pay its bills in full in a timely manner, and used its credit cards to

-23-

gain time to pay its bills. Although knowing of the risk involved in A&S's business, and

its apparent lack of a "cushion" to pay outstanding debt, Nationwide elected to continue

to do business with A&S without requiring any personal guarantee or security. The fact

that A&S could no longer keep all the balls in the air does not make Weiss personally

liable for the company's debt.

I also find that Weiss' optimism about the company continued throughout the time

he was doing business with Nationwide. Toward this end, I find persuasive the fact that

A&S made four payments in October 2011. If, in fact, Weiss knew that A&S was on the

verge of financial collapse, there would have been no reason for those payments to have

been made to Nationwide.

## III.  RULINGS OF LAW

Under Massachusetts law, common law claims for deceit or fraudulent

misrepresentation may form the basis of a claim under Mass. Gen. Laws ch. 93A. Rodi

v. S. New England Sch. of Law, 389 F.3d 5, 20 (1st Cir. 2004). See also Datacomm

Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778, 489 N.E.2d 185, 197 (1986)

("it is clear that common law actions for fraud and deceit are within the contemplation of

an 'unfair act' under [Chapter 93A]").

A person who is acting within the scope of his authority as an officer of a

company may be held personally liable for his own misrepresentations under Mass. Gen.

Laws ch. 93A. See Standard Register Co. v. Bolton-Emerson, Inc., 38 Mass. App. Ct.

545, 551, 649 N.E.2d 791, 794-95 (1995).

To prevail on a claim for fraudulent misrepresentation, the plaintiff "must establish that the defendant 'made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage.'" Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 458, 772 N.E.2d 1054, 1066 (2002) (quoting Danca v. Taunton Sav. Bank, 385 Mass. 1, 8, 429 N.E.2d 1129 (1982)) (additional citation omitted).  "Such reliance by the plaintiff must be reasonable." Masingill v. EMC Corp., 449 Mass. 532, 540, 870 N.E.2d 81, 88 (2007), and cases cited. Similarly, to prevail under ch. 93A, like on the underlying tort claims, the plaintiff must establish that his reliance was reasonable.  See Trifiro v. NY Life. Ins. Co., 845 F.2d 30, 34 (1st Cir. 1988).

"[T]he recipient of a misrepresentation is not justified in relying on it if a mere cursory glance would have disclosed the falsity of the statement or if the recipient 'closes its eyes and passively accepts the contradictions that exist in the information available to it.'" Ruggers, Inc. v. US Rugby Football Union, Ltd., 843 F. Supp. 2d 139, 147 (D. Mass. 2012) (citing Mass. Laborers' Health & Welfare Fund, 62 F. Supp. 2d 236, 243 (D. Mass. 1999)).  It is unreasonable "to rely on a statement the veracity of which one should doubt[.]"  Trifiro v. NY Life Ins. Co., 845 F.2d 30, 34 (1st Cir. 1988).

"As a general proposition, in Massachusetts 'only statements of fact are action-able; statements of opinion cannot give rise to a deceit action.'"  NPS LLC v. Ambac Assurance Corp., 706 F. Supp. 2d 162, 171 (D. Mass. 2010) (quoting Cummings v. HPG

Int'l, Inc., 244 F.3d 16, 21 (1st Cir. 2001)).  "Statements of opinion and belief, however,

may be actionable if such an 'opinion is inconsistent with facts known at the time they

are made.'"  Id. (quoting Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 809

N.E.2d 1017, 1030 n.24 (2004)).

     As the court explained in Rodi v. S. New England Sch. of Law, 389 F.3d 5 (1st

Cir. 2004):

> A statement, though couched in terms of opinion, may constitute a
> statement of fact if it may reasonably be understood by the reader or
> listener as implying the existence of facts that justify the statement
> (or, at least, the non-existence of any facts incompatible with it).
> *See McEneaney v. Chestnut Hill Realty Corp.,* 38 Mass. App. Ct.
> 573, 650 N.E.2d 93, 96 (1995); *see also Restatement (Second) of
> Torts* § 539 (1977) (explaining that "[a] statement of opinion as to
> facts not disclosed [may] be interpreted ... as an implied statement
> that the facts known to the maker are not incompatible with his
> opinion"); *cf. Levinsky's, Inc. v. Wal–Mart Stores, Inc.,* 127 F.3d
> 122, 127 (1st Cir.1997) ("A statement couched as an opinion that
> presents or implies the existence of facts which are capable of being
> proven true or false can be actionable.").  Thus, it is an actionable
> misrepresentation for a corporation falsely to tell investors that a
> specific project is "a great success" that is "proceeding smoothly ...
> and better than expected" in order to keep them from pulling the
> plug.  *Stolzoff v. Waste Sys. Int'l, Inc.,* 58 Mass. App. Ct. 747, 792
> N.E.2d 1031, 1036-37, 1042 (2003).  Similarly, it is an actionable
> misrepresentation for a car dealer to tell a buyer that he "believes" a
> vehicle is in "good" condition when he knows that it has significant
> mechanical defects.  *Briggs v. Carol Cars, Inc.,* 407 Mass. 391, 553
> N.E.2d 930, 933 (1990).

Id. at 14.

     The general rule in Massachusetts is "that statements promissory in nature and

statements of conditions to exist in the future are not actionable."  Bolen v. Paragon

Plastics, Inc., 754 F. Supp. 221, 226 (D. Mass. 1990).  "There is an important exception made to this rule, however, if at the time the defendant made the statement, he or she did not intend to carry out the promise."  Id.  That is because "[u]nder Massachusetts law, lack of present intent constitutes a misrepresentation of a material fact."  Id.

"When a future event is not substantially within the defendant's control, a defendant's statement about a future event cannot be a misrepresentation."  Benham v. Lenox Sav. Bank, 26 F. Supp. 2d 231, 236 (D. Mass. 1998) (citing Yerid v. Mason, 341 Mass. 527, 170 N.E.2d 718 (1960)).

"To draw the difficult distinction between a statement of fact and a statement of opinion, Massachusetts courts have looked to the Restatement (Second) of Torts, which provides that a representation is one of opinion 'if it expresses only (a) the belief of the maker, without certainty, as to the existence of fact; or (b) his judgment as to quality, value, authenticity, or other matters of judgment.'"  Cummings v. HPG Int'l, Inc., 244 F.3d 16, 21-22 (1st Cir. 2001) (quoting Restatement (Second) of Torts § 538A (1977)) (additional citations omitted).

It is "well settled" "that one who buys goods with a preconceived intention not to pay for them is guilty of a fraud upon the vendor which makes the contract voidable at the vendor's election."  Watson v. Silsby, 166 Mass. 57, 58, 43 N.E. 1117 (1896).

> On the other hand, it is generally held that mere insolvency of the buyer, with a probability that he will not be able to pay for the property, although known to him and not disclosed to the seller, will not defeat the contract, if the purchase is made with a hope to be able to pay, and with an intention to pay, if possible.  The ability of

> purchasers to pay for goods bought on credit is often a matter of great uncertainty, and in the absence of any other fraudulent conduct it would be too strict a rule to hold one guilty of fraud for buying without the present means to pay, if he has a hope and a purpose to pay, if possible, in the future.  But one is presumed to intend the ordinary and natural consequences of his act, and a purchase of property without any reasonable expectation of paying for it may be evidence of an intention to obtain it without paying for it at any time. A purchase with such a preconceived intention is a fraudulent act.

Id. at 59, 43 N.E. at 1117 (internal citations omitted).  "But to constitute a fraud which will avoid the contract, there must be a definite, conscious intent not to pay."  Id. at 61, 43 N.E. at 1118.

Where a company's representation is merely "normal commercial puffing," it is an inactionable statement of opinion.  Cummings, 244 F.3d at 21.  Thus, a company's "kind of general, rosy affirmation," is mere puffery and is not "material to any reasonable analysis of the company's prospects."  NPS, LLC v. Ambac Assur. Corp., 706 F. Supp. 2d 162, 171 (D. Mass. 2010) (quoting Orton v. Parametric Tech. Corp., 344 F. Supp. 2d 290, 301 (D. Mass. 2004)).  Similarly, "vague soft statements are not actionable" since it is not reasonable to rely on them in making financial decisions.  See In re Lernout & Hauspie Sec. Litig., 286 B.R. 33, 42-43 (D. Mass. 2002), and cases cited.

Where alleged misrepresentations consist "only of opinions as to future events" a plaintiff cannot "justifiably rely on these opinions as 'facts.'"  Schott Motorcycle Supply Inc. v. Am. Honda Motor Co., Inc., 976 F.2d 58, 65 (1st Cir. 1992) (Honda's alleged representations to a franchisee concerning its intent to remain committed to the motor-cycle industry not actionable; "[t]hese general statements in the context of franchisor-

franchisee communications constitute nothing more than 'puffing' or 'trade talk,' upon which no reasonable person would rely.").

Finally, where financial projections "were expected or predicted goals – not ironclad guarantees[,]" they cannot form the basis of an action for fraud where there is no evidence that the defendant knew "that the estimated levels of sales and profits could not be attained" or "that defendant harbored a secret intention or purpose not to strive for their fulfillment." Kelly Tire Serv., Inc. v. Kelly-Springfield Tire Co., 338 F.2d 248, 253 (8th Cir. 1964), cited in Schott Motorcycle Supply Inc., 976 F.2d at 65. "At best, these projections, however persuasive in shaping plaintiff's plans, were opinions subject to the uncontrollable economic influences of free enterprise and not fraudulent misrepresentations of past or existing facts on which plaintiff justifiably relied to its detriment." Id.[6]

## IV.  CONCLUSIONS

### April Orders

I find that at the time of the initial orders in March/April 2011, Weiss intended that A&S would pay for the books it was ordering from Nationwide and that Weiss believed that A&S would generate sufficient funds through its business to pay for the inventory it was ordering.  I further find that Weiss' belief that A&S would be profitable was

---

[6] Weiss has also submitted proposed rulings of law to the effect that A&S did not have a duty to disclose its financial condition to Nationwide.  However, Nationwide is not proceeding on this theory, but rather contends that Weiss made affirmative misrepresentations.  Moreover, this court has already determined that Nationwide has failed to establish a duty to disclose and cannot proceed on a claim based on any alleged failure to disclose A&S' deteriorating financial condition. (See Docket No. 30 at 10-11).  Therefore, this theory will not be discussed further.

consistent with the financial information available to him at the time, including, without limitation, the company's income as reported on tax returns and the fact that vendor payments generally were current.  Under such circumstances, Weiss did not act with fraudulent intent and is not liable for fraud.  See Watson, 166 Mass. at 58, 43 N.E. 1117.[7]

I further find that Nationwide has not established that Weiss either knew that his projected goals for A&S could not be attained, or that Weiss did not intend to work towards achieving such goals when he entered into business with Nationwide.  Under such circumstances, any projections made by Weiss cannot support a claim of fraud and Nationwide has failed to establish that Weiss knowingly made false representations of fact.  Therefore, Nationwide cannot prevail on its claim of fraud.  Kelly Tire Serv., Inc., 338 F.2d at 253.

I also find that even accepting Bredmehl's testimony in full, Nationwide has failed to establish that any of the statements Weiss allegedly made in connection with his initial business transactions with Nationwide constituted a false representation of a material fact.  According to Bredmehl, at most Weiss said that A&S' business was doing well, and that there were opportunities for growth in connection with the Borders closings.  This is "normal commercial puffing" and constitutes inactionable statements of opinion. Cummings, 244 F.3d at 21.  Moreover, given that Weiss did attempt to grow A&S in

---

[7]  Although Nationwide relies principally on this case, Watson supports Weiss' position that there is no liability where "the purchase is made with a hope to be able to pay, and with an intention to pay, if possible."  Watson, 166 Mass. at 58, 43 N.E. at 1117.

accordance with the business plan he outlined to Bredmehl, I find that he did not act with any fraudulent intent, and his statements about his hope for the future condition of the company cannot form the basis for a claim of misrepresentation.  Id. at 21-22; Benham, 26 F. Supp. 2d at 236.

## June Orders

I also find that Nationwide has failed to establish that Weiss is liable for fraud and deceit in connection with the June orders.  As an initial matter, I find that Weiss' continued belief that A&S would be profitable and would be able to pay its bills to be reasonable, for the reasons stated above.  Nationwide has not established that anything had occurred since the initial orders which would render Weiss' continued optimism unreasonable.  This is especially true since I accept as true Weiss' testimony that in his experience as much as 40% of A&S' Halloween business could occur within a few days of Halloween.

I also find that Nationwide has failed to establish that Weiss made any material misrepresentations of fact on which Bredmehl relied in connection with the June orders. As detailed above, according to Bredmehl Weiss merely stated that the books were selling.  There were no express representations identified on which Bredmehl could be found to have relied in deciding to ship the books in June without awaiting payment of the April invoices.  Again, even assuming that Weiss made general statements that business was good, such statements would be insufficient to support a claim of fraud. See Schott Motorcycle Supply, Inc., 976 F.2d at 65.

Other events in July further mandate a finding that Weiss is not liable for fraud for orders made during this period.  For example, A&S' payment of $10,795.20 on July 20th is further evidence that Weiss continued to believe that A&S would be able to pay its bills.  I find that A&S would not have made that payment if it believed that it was going out of business.

Moreover, according to Bredmehl, in July Weiss gave him a "plausible business reason" why payments had not been made to date.  Bredmehl's testimony makes it clear that Bredmehl was aware that A&S' ability to pay would depend on future business conditions.  Such statements of opinion about events that were "subject to the uncontrollable economic influences of free enterprise" are not actionable.  Kelly Tire Serv., Inc., 338 F.2d at 253.

For all these reasons, Nationwide's claim of fraud with respect to the June orders must fail.

### September Order

For all the reasons stated above, Weiss also is not liable for fraud in connection with the September order which was shipped on September 22, 2011.  Nationwide has not established that Weiss acted with fraudulent intent, nor has Nationwide identified any specific representations on which to base its claim.  The generalized statements about good business conditions are insufficient to establish a claim of fraud.  Similarly, the fact that Weiss portrayed the company's future as rosy constitutes mere puffery and is not actionable.  NPS, LLC, 706 F. Supp. 2d at 171.

Moreover, according to Bredmehl, by this point Weiss was talking about receiving money from the Halloween sales.  Thus, by this time it is even clearer that Weiss was just expressing his hope that at the end of Halloween there would be sufficient funds to pay the overdue amounts owed to Nationwide.  He made no representation that the company had already earned and was holding the funds with which it expected to pay Nationwide.

Even assuming that Weiss should have undertaken a more detailed analysis of A&S' financial condition as Halloween was approaching, by September, any reliance by Bredmehl on any alleged promises of payment by Weiss was unreasonable as a matter of fact and law.  According to Bredmehl, Weiss had promised to make regular partial payments for months, but had only made two payments totaling $16,000, leaving hundreds of thousands of dollars unpaid.  It was unreasonable for Bredmehl to rely on any statements regarding payment.  Trifiro v. NY Life Ins. Co., 845 F.2d 30, 34 (1st Cir. 1988).  Furthermore, the fact that Bredmehl himself initiated and pursued this order despite the lack of any significant payment establishes that Bredmehl was, like Weiss, willing to gamble on A&S' future success.  Nationwide has failed to establish that Weiss' statements were knowingly false when made, or that his optimism was so unsupportable as to constitute fraud.

### October Order

Finally, Weiss is not liable in fraud in connection with the October order.  This order, which also was initiated by Bredmehl, was shipped in November, after Halloween and while over $200,000 in bills remained outstanding.  Not only has Nationwide failed

to identify any actionable statements of fact allegedly made by Weiss, but Bredmehl's reliance on any promise Weiss may have made also was unreasonable as a matter of fact and law. Admittedly, some partial payments were made in October. However, given that A&S was supposed to be earning most of its income in October, Bredmehl should have been put on notice that payment of the outstanding bills was unlikely since the amounts A&S paid were so insignificant. Moreover, the October payments were less frequent than had allegedly been promised. Where, as here, Bredmehl "closed his eyes" and elected to ignore the contradictions that were evident in Weiss' statements and actions, his reliance on Weiss' alleged assurances were unreasonable. Ruggers, Inc. v. US Rugby Football Union, Ltd., 843 F. Supp. 2d 139, 147 (D. Mass. 2012).

On the other hand, the fact that A&S was making payments in October is evidence that Weiss was not acting with fraudulent intent. Again, if Weiss had understood that A&S was collapsing, there would have been no reason to make those payments.

This court cannot ignore the fact that Nationwide controlled the content, value and timing of the shipments to A&S. Nationwide was under no contractual obligation to make any of the shipments for which it is seeking payment. I find that Bredmehl shared in Weiss' dreams of a profitable year despite the risks of the business in which they were engaged. "The ability of purchasers to pay for goods bought on credit is often a matter of great uncertainty[.]" Watson, 166 Mass. at 58, 43 N.E. at 1117. The fact that a company finds itself unable to pay its bills is insufficient to establish a claim of fraud.

## V.   **ORDER**

For all the reasons detailed herein, judgment shall be entered in favor of the

defendant Andrew Weiss.

   / s / Judith Gail Dein       

Judith Gail Dein
U.S. Magistrate Judge
